**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| ABRAHAM ATACHBARIAN, individually and on behalf of all others similarly situated, <br><br>                Plaintiff, <br><br>     v. <br><br> CARNIVAL CORPORATION, CARNIVAL PLC, ARNOLD W. DONALD, DAVID BERNSTEIN, and MICKY ARISON, <br><br>              Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

       Plaintiff, Abraham Atachbarian ("Plaintiff"), brings this action on behalf of himself and all other sellers of put contracts and purchasers of calls option for the shares of Carnival Corporation (NYSE: CLL)("Carnival" or "CCL") common stock during the class period, which is set forth below (the "Class"). Plaintiff alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (1) options pricing data pertaining to CCL stock; (2) the public filings of Carnival and Carnival plc (together, "Carnival" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (3) the Company's public statements in press releases, meetings with security analysts and other presentations; and (4) other public information regarding the Company and the cruise line industry. Plaintiff believes substantial additional evidentiary support for the claims alleged herein exist and can be obtained with a reasonable opportunity for discovery.

**JURISDICTION AND VENUE**

1.      Plaintiff alleges violations of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.      In connection with the alleged violations, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including mails and interstate wire and telephone communications.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4.      Venue in the Southern District of Florida is proper pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Many of the alleged unlawful acts, practices and transactions complained of herein, including the preparation and dissemination of materially false and misleading statements of material fact occurred in whole or in part at Carnival's principal executive offices in the Southern District of Florida.

**PARTIES**

5.      Plaintiff Abraham Atachbarian is a citizen of the state of California. Plaintiff sold put option contracts for CCL shares at prices that were artificially inflated during the Class Period, and had common shares put to him at inflated prices, and suffered damages caused by defendants alleged violations of federal securities laws.

6.      Defendant Carnival is incorporated in the Republic of Panama and maintains its principal executive office at 3655 N.W. 87th Avenue, Miami, Florida, 33178.  Carnival's shares are a U.S. equity that trades on the NYSE under the symbol "CCL". As of the date of this filing there were 472,400,000 shares of CCL outstanding.

7.      Defendant Carnival plc is incorporated in England and Wales, and maintains its principal executive offices at Carnival House, 100 Harbour Parade, SO15 1st, Southhampton, United Kingdom.  Carnival plc shares trade on the London stock exchange under the symbol "CCL LN". There are as of the date of this filing 155,580,000 million shares of CCL LN outstanding.

8.      Defendants Carnival and Carnival plc operate a dual-listed company called Carnival Corporation & plc, which operates as a single economic enterprise with a single senior executive management team and identical Boards of Directors.

9.      Defendant Arnold W. Donald is and has been Carnival's President and Chief Executive Officer of Carnival since 2013, a Carnival Corporation Director since 2001 and a Carnival plc Director since 2003.

10.     Defendant David Bernstein is and has been the Company's Chief Financial Officer since 2007 and Chief Accounting Office since 2016.

11.     Defendant Micky Arison is and has been the Chairman of the Carnival Corporation's Board of Directors since 1990 and Chairman of the Carnival plc Board of Directors since 2003.

12.     Defendants Donald, Bernstein, and Arison are collectively referred to hereafter as the "Individual Defendants."

13.     Each Individual Defendant, because of his position(s) with Carnival, and/or his signing of Company documents filed with the SEC, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each Individual Defendant was provided with copies of the Company's reports, presentations, and press releases alleged

3

herein to be misleading prior to, or shortly after, their public dissemination and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each Individual Defendant knew that the adverse facts specified herein had not been disclosed and were concealed from the public, and that public statements being made were rendered materially false and/or misleading.

14.     Carnival and the Individual Defendants are collectively referred to hereafter as the "Defendants."

## STATEMENT OF FACTS

15.     This is a federal securities class action on behalf of a class of all persons and entities who sold put option contracts or purchased call options for the shares of Carnival common stock (the "Class") during the period of January 27, 2020 through May 1, 2020 (the "Class Period").

16.     During the Class Period, Defendants made repeated statements about the safety precautions it was instituting in its ships, and its preparedness to deal with the Coronavirus pandemic, and to keep its crew and passengers safe. At the time that it was making these statements, however, defendants were failing to institute proper measures to protect their passengers and crew from the COVID-19 virus, which would run rampant in its ships.  It nonetheless continued to make these statements or to conceal information about the COVID-19 spread on its ships in order to "keep the party going" and continue a steady level of books and revenues. When the truth was disclosed, on May 1, 2020, Carnival's share price fell from $15.90 to $13.93.

17.     Carnival's share price has not recovered to levels that it had experienced before the May 1 stock drop.

18.     Carnival represents itself as the world's largest cruise company, carrying nearly 45 percent of global cruise guests with operations in North America, Australia, Europe and Asia, and 104 cruise ships. Carnival claims to have recognized that safety and comfort of its guests and crew are paramount to the success of its business. Carnival claims its highest responsibilities and its top priorities are to operate safely.

19.     On January 27, 2020, *Bloomberg News* reported that Carnival stated that "Although the [COVID-19] risks to our guests, crew and business around the world is *very low*, we are closely monitoring the situation."

20.     On January 28, 2020, the Company announced that Debra Kelly-Ennis resigned from her position as a Director of Carnival and Carnival plc on January 27, 2020, effective that same day including her role as a member of their Health, Environmental, Safety and Security ("HESS") Committees.[1] Carnival's HESS Committees, among other things, supervise and monitor the Company's health and safety policies and programs and review with management significant risks or exposures and actions required to minimize such risks.

21.     On January 28, 2020, Carnival filed its Form 10K for its fiscal year ended November 30, 2019 (the "2019 Form 10K"). Defendants made several statements regarding the safety of its cruise ships in its 2019 Form 10K, including:

> Our commitments to the safety and comfort of our guests and crew and protecting the environment are paramount to the success of our business. We are committed to operating a safe and reliable fleet and protecting the health, safety and security of our guests, employees and all others working on our behalf. We continue to focus on further enhancing the safety measures onboard all of our ships. We are

---

[1] https://www.bloomberg.com/press-releases/2020-01-28/carnival-plc-director-resignation-new-board-committee-appointments

dedicated to fully complying with, or exceeding, all legal and statutory requirements related to health, environment, safety, security and sustainability throughout our business.

\*     \*     \*

Health, Safety and Security Goals: Continue to build on our commitment to protect the health, safety and security of guests, employees and all others working on our behalf to ensure that we are compliant with legal and regulatory requirements and that these areas of our business operate in an efficient manner we: [1] Provide regular health, environmental, safety and security support, training, guidance and information to guests, employees and others working on our behalf. [2] Develop and implement effective and verifiable management systems to fulfill our health, environmental, safety, security and sustainability commitments. [3] Perform regular shoreside and shipboard audits and take appropriate action when deficiencies are identified. [4] Report and investigate all health, environmental, safety and security incidents and take appropriate action to prevent recurrence. [5] Identify those employees responsible for managing health, safety, environment, security and sustainability programs and ensure that there are clear lines of accountability.

\*     \*     \*

We have implemented and continue to enhance policies and procedures that demonstrate our commitment to the safety of our guests and crew. These policies *and procedures include the following: [. . .] Identifying and standardizing best* practice policies and procedures in health, environment, safety and security disciplines across the entire organization including on all our ships.

\*     \*     \*

We are committed to providing a healthy environment for all of our guests and crew. We collaborate with public health inspection programs throughout the world, such as the Centers for Disease Control and Prevention in the U.S. ('CDC') and the SHIPSAN Project in the EU to ensure that development of these programs leads to enhanced health and hygiene onboard our ships.

22.      On January 31, 2020, in an article headed Cruise Lines and Hotels Make Changes

Amid Coronavirus Outbreak,[2] the *Travelmarket Report* quoted Carnival as stating: "Although the

risk to our guests and crew is low, we are closely monitoring the evolving situation with respect

---

[2] http://www.travelmarketreport.com/articles/Cruise-Lines-and-Hotels-Make-Changes-Amid-Coronavirus-Outbreak

to Coronavirus.  Our medical experts are coordinating closely with the U.S. Centers for Disease Control and Prevention (CDC) and the World Health Organization (WHO) to implement enhanced screening, prevention and control measures for our ships, guests and crew."

23.     Unbeknownst to the Plaintiff and other members of the Class, Carnival's statements respecting its safety practices and policies were misleading as its safety practices were woefully inadequate to protect the Company's passengers, crew or business from COVID-19, and thus the risks to Carnival's passengers, crew and business were not low.

24.     Carnival's policies and practices, in fact, misleadingly downplayed COVID-19 to "keep the party going" on its cruise ships, while posing life threatening, potentially fatal risks to Carnival passengers, crew and business.

25.     On February 3, 2020, *Bloomberg News* reported that the Carnival ship, Diamond Princess, and its 2,666 passengers and 1,045 crew were quarantined in Japan after a Hong Kong man who had sailed on the Diamond Princess from January 20-25, 2020 was confirmed to have been infected by COVID-19.[3]

26.     *Bloomberg News* further reported that Carnival said in an emailed statement Monday, February 3, 2020 that the passenger embarked in Yokohama, Japan, on January 20 and disembarked in Hong Kong on Jan. 25. The ship, Diamond Princess, then continued its round-trip journey to ultimately take other passengers back to Yokohama, which is near Tokyo. *Id.*

27.     *Bloomberg News* reported that on Saturday [February 1], the passenger, who was from Hong Kong, tested positive for coronavirus at a local hospital there, according to Princess. *Id.*

---

[3] https://www.bloomberg.com/news/articles/2020-02-03/coronavirus-sickened-cruise-customer-on-carnival-s-princess-line

28.     On February 4, 2020, Carnival confirmed that 10 people on the Diamond Princess tested positive for Coronavirus: two Australian guests; three Japanese guests; three guests from Hong Kong; and one guest from the U.S.; and one Filipino crewmember.[4]

29.     On February 6, 2020, Carnival stated that 41 people on the still quarantined Diamond Princess tested positive for Coronavirus are from Argentina (one); Australia (five); Canada (five), Japan (21); United Kingdom (one) and United States (eight).[5]

30.     On February 12, 2020, Carnival issued a press release[6] via PRNewswire stating:

> Carnival [] is closely monitoring the evolving situation with respect to Coronavirus.  The safety of guests and employees, compliance and protecting the environment are top priorities for the company. The company's medical experts are coordinating closely with the U.S. Centers for Disease Control and Prevention and the World Health Organization to implement enhanced screening, prevention and control measures for its guests, crew and ships.

31.     This disclosure was misleading in that it again emphasized that Carnival was taking sufficient safety measures and that the number of passengers and crew members getting sick was under control, and that their operations were safe.

32.     On March 4, 2020, Carnival stated that it had been notified that the United States Centers for Disease Control and Prevention (CDC) was investigating a small cluster of COVID-19 (coronavirus) cases in Northern California connected with Carnival's February 11-21, 2020 round trip cruise from San Francisco on the Grand Princess.

33.     On March 5, 2020, Carnival reported that samples from 45 of 3,533 people on board the Grand Princess were taken for processing.  On March 6, 2020, Carnival stated that 21

---

[4] https://www.princess.com/news/notices_and_advisories/notices/diamond-princess-update.html

[5] https://www.princess.com/news/notices_and_advisories/notices/diamond-princess-update.html

[6] https://www.prnewswire.com/news-releases/carnival-cruise-line-announces-pause-in-service-301023389.html

of the 45 people tested positive for COVID-19, two passengers and nineteen crew members.[7]  In total, the Grand Princess had at least 103 COVID-19 cases and two deaths.[8]

34.     Carnival nonetheless continued sailing despite the dangers and what should have been obvious to it—that its safety precautions were insufficient.  On March 7, 2020, the Carnival ship, MS Zaandam departed from Buenos Aires, Argentina slated to conclude its voyage on March 21 in San Antonio, Chile.[9]  A week later, the cruise itinerary was canceled.  The journey continued without a destination.  People aboard the Zaandam, mostly crew members, began falling ill with flu like symptoms.  By March 22, passengers were confined to their rooms.  Carnival's MS Rotterdam was sent to bring crucial medical supplies to the Zaandam.  While en route to the Zaandam, the 600 crew were told that instead of just dropping off medical supplies, the MS 3Rotterdam would be picking up healthy passengers from the Zaandam to prevent the as-of-then-undiagnosed sickness from spreading.

35.     Contrary to its public statements, the safety of the Carnival crew was not the Company's top priority.  Carnival was taking "healthy crew members from all over the world" and dropping them "in the middle of the virus." The *Business Insider* reported, Rotterdam crew members felt tricked.  *Id*.

36.     On February 12, 2020, Carnival issued a press release[10] via *PRNewswire* stating:

---

[7] https://www.princess.com/news/notices_and_advisories/notices/grand-princess-updates.html

[8] https://www.usatoday.com/story/travel/cruises/2020/05/01/coronavirus-congress-investigate-carnival-corp-s-virus-response/3066565001/

[9] https://www.businessinsider.com/holland-america-zaandam-rotterdam-coronavirus-stricken-ships-2020-4

[10] https://www.prnewswire.com/news-releases/carnival-cruise-line-announces-pause-in-service-301023389.html

Carnival [] is closely monitoring the evolving situation with respect to Coronavirus. The safety of guests and employees, compliance and protecting the environment are top priorities for the company. The company's medical experts are coordinating closely with the U.S. Centers for Disease Control and Prevention and the World Health Organization to implement enhanced screening, prevention and control measures for its guests, crew and ships.

37.     On March 13, 2020, Carnival issued a press release[11] via *PRNewswire* stating:

Carnival Cruise Line announced today that it is pausing operations immediately across its fleet of ships based in North America and will resume them on Friday, April 10. All ships currently at sea will continue their voyages and return to their homeports as scheduled.

Throughout this COVID-19 situation that has now turned into a global pandemic, we have implemented higher and higher levels of screening, monitoring and sanitation protocols to protect the health and safety of our guests, crew and the communities we serve. While Carnival has not had a diagnosed case linked to our operation we realize this situation is bigger than the cruise industry and we will continue to do our part to support public officials to manage and contain this unprecedented public health challenge.

38.     On March 16, 2020, Carnival filed its Form 8-K/A with the SEC which states,

among other things:

Due to the spread and recent developments, including growing port restrictions around the world, related to the COVID-19 outbreak, the Corporation previously announced a voluntary and temporary pause of its fleet cruise operations by its continental Europe and North American brands. Subsequently, the Corporation implemented a temporary pause of its global fleet cruise operations across all brands…..[t]he Corporation believes the ongoing effects of COVID-19 on its global bookings and operations will have a material negative impact on its financial results and liquidity.

39.     On March 19, 2020, 2,700 passengers aboard Carnival's Ruby Princess were

allowed to freely disembark in Sydney, Australia despite passengers on board showing signs of

respiratory illnesses, and some being transported to hospital with COVID.-19 like symptoms. At

least 662 people linked to the cruise have been diagnosed with COVID-19, and eleven persons

---

[11] https://www.prnewswire.com/news-releases/carnival-cruise-line-announces-pause-in-service-301023389.html

on the Ruby Princess have died. A criminal investigation of Carnival by Australian authorities stemming from Carnival's representations prior to docking that COVID-19 was not an issue on the ship. .. [12]

40.    The *Guardian* quoted Australian home affairs minister Peter Dutton as stating: "It's clear that some of the companies [referring to Carnival] have been lying about the situation of the health of passengers and crew on board . . ." *Id.*

41.    The *Guardian* further reported that an email said to be from a Ruby Princess crew member at the end of March states: "The crew is sick and getting sicker" "No idea how many actually have Covid but many have symptoms including lack of taste & smell." *Id.*

42.    On March 27, 2020, Carnival, through its subsidiary Holland America Line, reported[13] that 53 of the 1,243 passengers and 85 of the 586 crew members reported to the Zaandam's medical center with flu like symptoms.  Four Zaandam passengers had died. Carnival further announced:

> a plan to transfer groups of healthy Zaandam guests to Rotterdam, with strict protocols for this process developed in conjunction with the U.S. Centers for Disease Control and Prevention (CDC). Only those who have not been ill will be moved, and health screenings will be conducted before transferring. Once aboard Rotterdam, all guests will continue to remain in their staterooms until disembarkation. Any guests who are currently ill, or in isolation as a close contact, and all crew will remain on Zaandam.

43.    On March 31, 2020, Carnival filed with the SEC a Preliminary Prospectus Supplement to Prospectus dated March 9, 2018 on Form 424(B)(5) seeking to raise $1.25 billion

---

[12] https://www.theguardian.com/world/2020/apr/05/criminal-investigation-launched-ruby-princess-cruise-ship-coronavirus-disaster

[13] https://www.hollandamerica.com/blog/ships/ms-zaandam/statement-regarding-zaandam/

from the sale of Carnival Corporation common stock. The Carnival preliminary prospectus

supplement disclosed, among other things, that:

> COVID-19 has had, and is expected to continue to have, a significant impact on our financial condition and operations, which impacts our ability to obtain acceptable financing to fund resulting reductions in cash from operations. The current, and uncertain future, impact of the COVID-19 outbreak, including its effect on the ability or desire of people to travel (including on cruises), is expected to continue to impact our results, operations, outlooks, plans, goals, growth, reputation, cash flows, liquidity, and stock price.

> The spread of COVID-19 and the recent developments surrounding the global pandemic are having material negative impacts on all aspects of our business. We have implemented a voluntary pause of our global fleet cruise operations across all brands and such pause may be prolonged.

> *   *   *

> To date we have incurred, and expect to continue to incur, significant costs as we bring currently ongoing cruises to a conclusion, provide air transportation to return our passengers to their home destinations and assist some of our crew that is, or will be upon docking, unable to return home, with food and housing.

> *   *   *

> Due to the outbreak of COVID-19 on some of our ships, and the resulting illness and loss of life in certain instances, we have been the subject of negative publicity which could have a long term impact on the appeal of our brand, which would diminish demand for vacations on our vessels.

> *   *   *

> We have received, and expect to continue to receive, lawsuits from passengers aboard the Grand Princess voyage in February 2020. We may receive additional lawsuits stemming from COVID-19. We cannot predict the quantum or outcome of any such proceedings and the impact that they will have on our financial results, but any such impact may be material. We also remain subject to extensive, complex, and closely monitored obligations under the court-ordered environmental compliance plan supervised by the U.S. District Court for the Southern District of Florida, as a result of the previously disclosed settlement agreement relating to the violation of probation conditions for a plea agreement entered into by Princess Cruises and the U.S. Department of Justice in 2016. We remain fully committed to satisfying those obligations. However, COVID-19 presents enormous challenges for the Company, which could result in material adverse impacts.

\*   \*   \*

As a result of the COVID-19 outbreak, we have paused our global fleet cruise operations, and if we are unable to re-commence normal operations in the near-term, we may be out of compliance with a maintenance covenant in certain of our debt facilities.

44.   The true risk posed to Carnival's business stemming from its "keep the party going" safety policies and practices in the wake of COVID-19 was revealed in Carnival's Issuer Free Writing Prospectus dated April 1, 2020 when the Company priced its offering of 62,500,000 shares of common stock at $8.00 per share to raising a mere $485 million after underwriter's discounts, down from the $1.25 billion the Carnival sought to raise as indicated a day earlier in its preliminary prospectus.

45.   In its Prospectus Supplement dated April 1, 2020 to its Prospectus dated March 9, 2018 offering 62,500,000 shares of Carnival stock Carnival stated:

The spread of novel coronavirus (COVID-19) and the recent developments surrounding the global pandemic are having material negative impacts on all aspects of our business. In particular:

Numerous passengers and crew on Diamond Princess were diagnosed with COVID-19 and the ship was quarantined at a port in Japan. As of the time of disembarkation, a substantial portion of the passengers and crew were diagnosed with COVID-19 and subsequently several passengers died due to the disease. Additionally, numerous passengers and crew on Grand Princess were diagnosed with COVID-19, some of whom subsequently died due to the disease.

Numerous passengers and crew on other ships, including Zaandam, Costa Luminosa, Ruby Princess, Costa Magica and Costa Favolosa, have been diagnosed with COVID-19. Numerous passengers and crew on Zandaam are currently experiencing flu-like symptoms, and some have died. Costa Magica and Costa Favolosa are currently working with the U.S. Coast Guard to facilitate medical evacuations, and both vessels are anchored near the port of Miami.

On March 13, 2020, we announced voluntary pauses of our global fleet cruise operations by our continental European and North American brands. Subsequently, we implemented a voluntary pause of our global fleet cruise operations across all brands. Each brand has separately announced the duration of its pause, but we expect such pauses to be extended (and some extensions have already been announced) and any such extensions may be prolonged. The pauses will be dependent in part on various travel restrictions and travel bans issued by various countries around the world.

As of the date hereof:

Substantially all our ships have disembarked their passengers. **There are approximately 6,000 passengers onboard ships still at sea that are expected to disembark their passengers by the end of April**. Some of our crew is unable to return home, and we will be providing them with food and housing. (emphasis added)

We have updated our cancellation policies, the terms of which vary widely by brand and sailing date, to permit cruisers to cancel certain upcoming cruises and elect to receive refunds in cash or future cruise credits. As an incentive to accept the future cruise credits, our brands have offerings which vary widely in terms but generally increase the value of the future cruise credits or onboard credits (credits that can be used as onboard spending money on a future sailing). **The volume and pace of cash refunds could have a material adverse effect on our liquidity and capital resources**. (emphasis added)

46.    On April 1, 2020, after the close of markets, Carnival issued a press release announcing that the Company had priced the previously announced underwritten public offering of 62,500,000 shares of common stock, par value $0.01 per share, of Carnival Corporation, at a price of $8.00 per share.

47.    At the end of trading on April 2, 2020, the market price of Carnival Corporation common stock (CCL:NYSE) closed at $7.97 per share, down 9% from the previous trading day. On April 1, 2020, the price of CCL stock closed at $8.80 per share, down 34% from the March

31, 2020 closing price of $13.31 per share.  From the beginning of the Class Period on January 27, 2020, the market price of CCL stock was down 82%.

48.     The declining market price of Carnival common shares substantively adversely impacted the risk of loss to sellers of put options as well as the risk of loss to purchasers of call options on CCL shares, causing the Plaintiff and other similarly situated Class members to incur substantial out of pocket damages. Plaintiff had been forced, because of his sales of put options during the Class Period, to purchase CCL shares at inflated prices which he retained on April 1, 2020 and through the end of the Class Period, thereby suffering substantial out of pocket damages.

49.     On April 16, 2020, *Bloomberg News* published an article headlined Carnival Executives Knew They Had A Virus Problem But Kept The Party Going.[14] Bloomberg reported that Carnival continued cruise operations despite knowing of the emergence of COVID-19 and that passengers and crew would spend prolonged periods in close proximity to each other, facilitating the rapid spread of the disease. In fact, Carnival's policies emphasized downplaying COVID-19 risks to "keep the party going" to the detriment of the health and well-being of passengers and crew. Bloomberg further reported that Carnival's failure to take appropriate safety precautions may have led to greater infections and the spread of the disease.  *Bloomberg News* quoted a senior CDC cruise ship task force official as saying she had a hard time believing the spread of coronavirus on Carnival ships was mere "happenstance."

50.     On May 1, 2020, *The Wall Street Journal* published an article headlined "Cruise Ships Set Sail Knowing the Deadly Risk to Passengers and Crew"[15] that, among other things,

---

[14] https://www.bloomberg.com/features/2020-carnival-cruise-coronavirus/

[15] https://www.wsj.com/articles/cruise-ships-set-sail-knowing-the-deadly-risk-to-passengers-and-crew-11588346502

detailed Carnival's conduct to conceal COVID-19 risks to passengers, crew members and public officials, such as:

    (a)    failing to take precautions, such as taking people's temperature, to minimize risks that COVID-19 infected persons would be permitted to board Carnival ships;

    (b)    failing to timely notify passengers and crew of COVID-19 cases on Carnival ships;

    (c)    failing to timely notify passengers and crew that they may have been exposed to COVID-19 on Carnival ships;

    (d)    **failing to notify government officials** about sick passengers and crew aboard Carnival ships before docking;

    (e)    failing to notify Carnival passengers and crew who unknowingly may have been exposed to COVID-19 passage to ports of call around the world; and

    (f)    failing to notify Carnival passengers and crew who unknowingly may have been exposed to COVID-19 to travel home at the conclusion of a voyage.

51.    *The Wall Street Journal* reported that by March 13, the CDC had linked cruise passengers to 17% of reported COVID-19 cases in the U.S. at the time. In terms of concealing or misstating information about the COVID-19 on Carnival ships the article states:

> The U.S. Coast Guard said it was investigating whether two cruise ships owned by Carnival Corp. violated federal law by failing to alert health authorities about sick travelers disembarking in San Francisco and Puerto Rico, the Journal found. A criminal investigation and a separate government-ordered probe are under way

in Australia about similar suspicions regarding a third Carnival-owned cruise ship. The company said it didn't believe it broke any laws.

* * *

The House Committee on Transportation and Infrastructure, signaling its intention to exercise its oversight role, sent letters Friday to Carnival, the CDC and the Coast Guard requesting copies of all memos, emails and other communications that pertained to Covid-19 or other infectious disease outbreaks aboard cruise ships.

Australia began a probe that could lead to criminal charges against Carnival or its staff regarding the March 8 voyage of the Ruby Princess around New Zealand. Authorities are trying to determine whether Carnival, or its Princess Cruises subsidiary, knew or should have known about potential Covid-19 cases before allowing some 2,700 passengers to disembark in Sydney.

In public hearings that began April 22, the ship's senior physician, Ilse Von Watzdorf, was asked why she didn't update the ship's medical log books to show that some ill people aboard the ship had been swabbed for possible Covid-19. "I did not have enough hours, I think" to update records, she testified.

Dr. Von Watzdorf said she wasn't sure why ship officers told shore officials it had no crew displaying possible Covid-19 symptoms before docking in Sydney. She also said the cruise company didn't brief her on the Diamond Princess Covid-19 outbreak, which she followed on social media.

[Carnival] said in a written statement that "it would be inappropriate for us to comment" on matters under official inquiry.

* * *

Carnival learned on March 2 that a passenger aboard a Feb. 11 voyage from San Francisco to Mexico on the Grand Princess had tested positive for Covid-19 after returning home to Placer County, Calif.

The man had disembarked on Feb. 21 in San Francisco, a day after visiting the ship's medical center with what Carnival's Chief Medical Officer Grant Tarling said at a March 7 news conference was a "six- to seven-day history of symptoms of an acute respiratory illness."

The Coast Guard is now investigating whether Carnival violated a federal law that requires ships approaching U.S. ports to report outbreaks of illness to the Coast Guard and, in certain cases, to the CDC. The rules are specific, defining a fever as a temperature of 100.4 degrees Fahrenheit or higher, as well as anyone who reports feeling feverish.

Lt. Cmdr. Matthew Kroll said Coast Guard officials only "indirectly received information regarding ill passengers and crew" on the Grand Princess. Mr. Frizzell,the Carnival spokesman, said the company "fully disclosed all of our illnesses to officials, as required."

On March 4, the man from Placer County died.

Twelve days after passengers disembarked, Carnival informed them they may have been exposed to the virus.

Vicki Eschelbach left the Grand Princess when it returned to San Francisco from Mexico on Feb. 21 and traveled home to Santa Rosa, Calif. She spent the next several days going to stores and attending church.

Ms. Eschelbach got the March 4 email from Princess Cruises saying she might have been exposed. "I was freaking out. Like, where am I spreading all these germs?" she said. She had no symptoms and didn't get tested.

That same day, Grand Princess passengers in the middle of the vessel's subsequent cruise to Hawaii received a letter saying the CDC was investigating "a small cluster of Covid-19" cases in Northern California that were connected to the ship's previous voyage to Mexico.

Some travelers and crew had stayed aboard the Grand Princess after the Mexico cruise for the Hawaii voyage, joining hundreds of new passengers who climbed aboard on Feb. 21. Among those on the Hawaii cruise, five people have died and 131 have tested positive, the U.S. Department of Health and Human Services said. County officials in California have so far traced five Covid-19 cases to the Mexico cruise, including two deaths.

*   *   *

The Costa Luminosa, owned by Carnival's Costa Cruises, set sail on March 5 from Fort Lauderdale to Puerto Rico and other stops in the Caribbean before heading back to Europe.

Shortly after the ship docked in San Juan three days later, an Italian couple were taken to Ashford Presbyterian Community Hospital. The woman had flu-like symptoms and difficulty breathing, said Dr. Rafael Gonzalez, the hospital's medical director.

While doctors treated the woman, hundreds of passengers left the ship to wander Old San Juan, swelled with people in town for a salsa festival.

"Everyone was allowed ashore. No problem," said Fabian de la Fuente, a passenger from Victoria, British Columbia. He said his entire family of five later tested positive for Covid-19.

The Costa Luminosa should have disclosed any contagious illnesses before the couple were admitted to the hospital, Dr. Gonzalez said. The staff was led to believe the Italian woman had pneumonia, he said.

When emergency-room staff asked if anybody else was sick on the ship, the ship's medical staff denied it, Dr. Gonzalez said. He later learned several crewmen were in quarantine for symptoms of Covid-19 at the time, he said.

"That's not right," the doctor said later in an interview. "That's just not right."

Any company that fails to properly notify the CDC of a serious outbreak of shipboard illness ahead of pulling into port can draw penalties as high as $200,000 for each violation. If a death is involved, the potential penalty can reach $500,000 for each case.

Ricardo Castrodad, a Coast Guard spokesman in San Juan, said maritime authorities weren't told of illnesses aboard the Costa Luminosa, or that passengers had been hospitalized, until after the ship left San Juan harbor on March 8 for Antigua. The Coast Guard is investigating, he said.

Carnival said in a written statement to the Journal that a ship physician suggested testing the woman for Covid-19 after she arrived at the hospital. Notifying the Coast Guard after the fact "was completely acceptable," the company said, because it was a medical emergency.

52.     *The Wall Street Journal* also reported in the May 1, 2020 article that the Chair of the House Committee on Transportation and Infrastructure Peter DeFazio and Chair of the House Subcommittee on Coast Guard and Maritime Transportation Sean Patrick Maloney had initiated a records request regarding the response of Carnival, and its nine affiliated cruise lines, to the coronavirus pandemic.

53.     The Committee on Transportation and Infrastructure Congressmen sought information regarding Carnival's not appropriately acknowledging serious health concerns in its public facing materials:

> While cruises are often viewed as a care-free escape from reality where passengers can dine, dance, relax, and mingle, we would hope that the reality of the COVID-19 pandemic will place a renewed emphasis on public health and passenger safety, but frankly that has not been seen up to this point. In fact, it seems as though Carnival Corporation and its portfolio of nine cruise lines, which represents 109 cruise ships, is still trying to sell this cruise line fantasy and ignoring the public health threat posed by coronavirus to potential future passengers and crew.

54.     On May 1, 2020, the U.S. House of Representatives Committee on Transportation and Infrastructure issued a request[16] that Carnival provide documents that reflect the information Carnival had, and when it received it, regarding potential infections, public health implications, and possible exposure of its passengers and crew to COVID-19, as well as information regarding the decisions made by Carnival concerning the health and safety of their passengers and crew.

55.     On May 1, 2020, Carnival's share price fell from $15.90 to $13.93 and the prices of Carnival options contracts were impacted accordingly further damaging Plaintiff and members of the Class. Plaintiff had been forced because of his sales of put options during the Class Period to purchase CCL shares at inflated prices which he retained through May 1, 2020, thereby suffering substantial out of pocket damages.

56.     The decline in the financial health of Carnival continues. On June 18, 2020, Carnival reported a record $4.4 billion in quarterly losses, as the COVID-19 pandemic crippled the world's biggest cruise operator and forced it to take major write-downs on the disposal of now redundant ships. Carnival said it had $7.6 billion available at the end of May 2020 but was burning $650 million a month as it awaits regulatory approvals for the resumption of some lines in the hope that customers will come back later this year.

---

[16] https://transportation.house.gov/imo/media/doc/PUBLIC%20-%202020-04-30%20-%20PAD-Maloney%20LTR%20to%20CARNIVAL%20RE%20COVID-19%20Response.pdf

57.     On June 22, 2020, Carnival advised guests and travel agents that it has extended its operational pause in North America through September 30, 2020.

58.     On June 24, 2020, the credit rating agency Standard & Poors lowered Carnival's debt rating to junk status.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

59.     Defendants each made materially false and misleading public statements and omissions to investors during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

60.     On January 27, 2020, Carnival was quoted by *Bloomberg News* as stating:

Although [COVID-19] risks to our guests, crew and business around the world is very low, we are closely monitoring the situation.

61.     The statement about "very low" COVID-19 risk was materially false and misleading when made because:

(a)     Carnival cruise ships promoted COVID-19 spread due to close quarters and extensive interaction between passengers and crew;

(b)     risks to guests, crew and Carnival's business was extraordinarily high;

(c)     Defendants intentionally downplayed the real level of COVID-19 risks to "keep the party going"; and

(d)     Defendants turned a blind eye to COVID-19 risks to avoid disclosing them to government officials, passengers and crew.

62.     Carnival's January 28, 2020, fiscal 2019 Form 10K, signed by each Individual Defendant, states:

We are committed to operating a safe and reliable fleet and protecting the health, safety and security of our guests, employees and all others working on our behalf.

63.     Defendants' statements about the health and safety of its guests and crew were materially false and/or misleading when made because:

(a)     Defendants intentionally misled passengers, crew and public officials about known COVID-19 risks;

(b)     Defendants failed to take precautions, such as taking people's temperature, to minimize risks that COVID-19 infected persons would be permitted to board Carnival ships;

(c)     Defendants failed to timely notify passengers and crew of COVID-19 cases on Carnival ships;

(d)     Defendants failed to timely notify passengers and crew that they may have been exposed to COVID-19 on Carnival ships;

(e)     Defendants failed to notify government officials about sick passengers and crew aboard Carnival ships before docking;

(f)     Defendants failed to notify Carnival passengers and crew who unknowingly may have been exposed to COVID-19 passage to ports of call around the world; and

(g)     Defendants failed to notify Carnival passengers and crew who unknowingly may have been exposed to COVID-19 to travel home at the conclusion of a voyage.

64.     Carnival's 2019 Form 10K further states:

We have implemented and continue to enhance policies and procedures that demonstrate our commitment to the safety of our guests and crew. These policies and procedures include the following: [] Identifying and standardizing best-practice policies and procedures in health, environment, safety and security disciplines across the entire organization including on all our ships.

65.     Defendants' statements about safety policies and procedures were materially false or misleading when made for the reasons set forth in paragraph 63.

66.     Carnival's statement published on January 31, 2020 in *Travelmarketreport.com* that "Although the risk to our guests and crew is low, we are closely monitoring the evolving situation with respect to Coronavirus" was materially false and/or misleading when made because of the reasons set forth in paragraph 61.

67.     On March 13, 2020, Carnival stated in an official Press Release:

> While Carnival has not had a diagnosed case linked to our operation we realize this situation is bigger than the cruise industry and we will continue to do our part to support public officials to manage and contain this unprecedented public health challenge.

68.     Carnival's statement regarding no diagnosed COVID-19 case linked to Carnival was materially false and misleading when made because Defendants knew of confirm cases of COVID-19 infections on Carnival ships, including, among others, the Diamond Princess.

**SCIENTER**

69.     During the Class Period, Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time. In so doing, Defendants engaged in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on sellers of option contracts to put CCL shares and on purchasers of call option contracts to call shares of CCL during the Class Period.

**PRESUMPTION OF RELIANCE**

70.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     Option contracts on CCL shares traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of option contracts on CCL shares; and

(e)     Plaintiff and the Class sold option contracts to put CCL shares or purchased call option contracts to call CCL shares during the Class Period without knowledge of the misrepresented or omitted facts.

71.     At all relevant times, the market for options contracts on CCL stock was efficient because: (1) as Carnival filed periodic public reports with the SEC; (2) Carnival was regularly covered by numerous security analysts; and (3) Carnival regularly communicated with public investors using established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

**LOSS CAUSATION**

72.     Defendants made materially false and misleading public statements during the Class Period that artificially deflated the market price of option contracts to put CCL shares and operated as a fraud or deceit on the Class. When the truth of Defendants' false and misleading statements was publicly disclosed the risks associated with the sale of put option contracts and

the risks associated with the purchase of call option contracts acts decreased precipitously as the artificial deflation came out of the market price over time. As a result of their sales of option contracts to put CCL shares or purchases of call options contracts during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

73.     Defendants' "Safe Harbor" warnings accompanying any forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

74.     Defendants are liable for any false and/or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Carnival who knew that the forward-looking statement was false. None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ALLEGATIONS

75.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who from January 27, 2020 to May 1, 2020 (the "Class Period") sold option contracts to put CCL shares or purchased call options

contracts to call CCL shares (the "Class").  Excluded from the Class are Carnival, the Individual Defendants and their immediate family members, and the directors, and officers of Carnival and their immediate family members.

76.    The members of the Class are so numerous that joinder of all members is impracticable. Typically, at least hundreds of option contracts to put CCL shares are sold each trading day.

77.    Option contracts to put CCL shares were sold by hundreds if not thousands of persons or entities during the Class Period.

78.    Option contracts to call CCL shares were purchased by hundreds of not thousands of persons or entities during the Class Period.

79.    Questions of law and fact common to members of the Class predominate over questions which affect individual Class members.  Common question of law and fact include:

(a)    Whether Defendants' alleged conduct violated the Exchange Act;

(b)    Whether Defendants' public statements omitted and/or misrepresented material facts;

(c)    Whether Defendants' public statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or recklessly disregarded facts that rendered that their public statements materially false and misleading;

(e)    Whether Defendants' conduct caused the Class members' damages and the extent of such damages; and

(f)     Whether the Individual Defendants were control persons within the

meaning of the Exchange Act in connection with the public statements

alleged to be materially false or misleading.

80.     Plaintiff will adequately protect the interests of the Class and has retained counsel

81.     Plaintiff has no interests that conflict with those of the Class.

82.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy.

## COUNT I

### Against All Defendants
### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5

83.     Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

84.     During the Class Period, Defendants carried out a plan, scheme, and course of

conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and

other members of the Class to sell option contracts to put CCL stock or to purchase options to

call CCL shares at artificial prices which did not reflect the true risks to Class members.

85.     Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made

untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (3) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the sellers of option contracts or purchasers of call option

contract for CCL shares in an effort to maintain artificial prices for option contracts in violation

of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

86.     Defendants, individually and in concert, directly and indirectly, by the use, means

or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and business prospects.

87.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, thereby damaging Plaintiff and the Class.

### COUNT II

### Against the Individual Defendants
### For Violations of Section 20(a) of the Exchange Act

88.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

89.     The Individual Defendants acted as controlling persons of Carnival within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Carnival, the Individual Defendants had the power and ability to control the actions of Carnival and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### RELIEF SOUGHT

WHEREFORE, Plaintiff prays for judgment as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the

Federal Rules of Civil Procedure;

(b)      Awarding compensatory damages in favor of Plaintiff and other Class

members against all Defendants, jointly and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      Awarding Plaintiff and the Class their reasonable costs and expenses

incurred in this action, including attorneys' fees and expert fees; and

(d)      Awarding such equitable/injunctive or other further relief as the Court may deem

just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.


Dated: July 21, 2020                    Respectfully submitted,

/s/ Joshua H. Eggnatz
Joshua H. Eggnatz, Esq. (Fla. Bar No.: 0067926)
E-mail: JEggnatz@JusticeEarned.com
**EGGNATZ | PASCUCCI**
7450 Griffin Rd, Ste. 230
Davie, FL 33314
Tel : (954) 889-3359
Fax : (954) 889-5913

***Local Counsel for Plaintiff Abraham Atachbarian***


***Of Counsel:***

Lynda J. Grant, Esq.
E-mail: LGgrant@grantfirm.com
**THEGRANTLAWFIRM, PLLC**
521 Fifth Avenue, 17th Floor
New York, NY 10175
Tel: (212) 292-4441
Fax: (212) 292-4442

Howard T. Longman, Esq.
E-mail: HLongman@ssbny.com
Patrick Slyne, Esq.
E-mail: pkslyne@ssbny.com
**STULL, STULL & BRODY**
6 East 45th Street
New York, NY 10017
Tel: (212) 687-7230
Fax: (212) 490-2022